# EXHIBIT 7B – Key Transcript Excerpts with Summary

This exhibit contains the most critical testimony demonstrating constitutional violations, including conflicting statements from law enforcement, lack of exigent circumstances, absence of a warrant, failure to investigate, DHR inaccuracies, and testimony confirming the innocence of Plaintiffs. Pages are organized by issue for judicial clarity.



PLAINTIFF'S
EXHIBIT
7B

--- *Transcript Page 1* ---

(Full page content preserved in Exhibit 7A. Refer there for original formatting.)

[Transcript Page 1 extracted]

1    IN THE NINETEENTH JUDICIAL CIRCUIT

2    IN AND FOR CHILTON COUNTY

3    CLANTON, ALABAMA

4    STATE OF ALABAMA

5    V.                              Case No. CC-22-82
                                              CC-22-50
6    JOHN EUBANKS and
     JESSICA SCOTT,
7
          Defendants.
8    _____/

9

10        COURT REPORTER'S TRANSCRIPT OF PROCEEDINGS

11        Proceedings taken in the above-styled cause

12   in the Chilton County Courthouse, Clanton, Alabama,

13   on May 3rd and 4th, 2022, before the Honorable Sibley

14   G. Reynolds.

15

16

17                      APPEARANCES

18   FOR THE STATE:         Chris Cleckley
                            Megan Williams
19                          Assistant District Attorneys

20   FOR THE DEFENDANT:     Richard White
21                          Alex V. Sallas
                            Attorneys at Law
22

23

24              OFFICIAL COURT REPORTER

25              Deborah M. Garrett, CSR

**--- Transcript Page 9 ---**

(Full page content preserved in Exhibit 7A. Refer there for original formatting.)

[Transcript Page 9 extracted]

```
1          possibility of what Judge Reynolds could do to
2          you.  Do you understand all of that,
3          Mr. Eubanks?
4               MR. JOHN EUBANKS:  Yes, sir, I do.
5               MR. WHITE:  Ms. Scott, you understand?
6               MS. JESSICA SCOTT:  Yes.
7               MR. WHITE:  Mr. Eubanks, at this time, it's
8          your decision to go forward with the jury trial?
9               MR. JOHN EUBANKS:  Yes.
10              MR. WHITE:  And, Ms. Scott, it's your
11         decision to go forward with the jury trial?
12              MS. JESSICA SCOTT:  Yes.
13              MR. WHITE:  That's all I have, Judge.
14              THE COURT:  Off the Record.
15                   (Brief recess was taken.)
16              THE COURT:  Back on the Record, please,
17         ma'am.
18              MR. WHITE:  Mr. Eubanks and Ms. Scott, did I
19         tell you clearly my opinion that if you did
20         something y'all shouldn't have done that we do
21         not need to do a trial?  Did I go over that
22         clearly with y'all?
23              MR. JOHN EUBANKS:  Yes.
24              MS. JESSICA SCOTT:  Yes.
25              MR. WHITE:  My position on misdemeanors when
```

*--- Transcript Page 14 ---*

(Full page content preserved in Exhibit 7A. Refer there for original formatting.)

[Transcript Page 14 extracted]

1    they will tell you would be their interpretation

2    of what they believe the evidence has shown you.

3    Just like 6:00 news.  It is their spin on what

4    they believe the evidence has shown you.

5         You together, those of you who will go to

6    the jury room to decide this case, you together

7    are the sole triers of fact.  You determine what

8    the facts are based on what you see, based on

9    what you hear.

10        I don't have a stake in the outcome of this

11   case.  It doesn't matter to me.  My job is to

12   tell you what the law is and to see that this

13   case gets moved along to its conclusion.

14        These attorneys have been trained to ask

15   questions a certain way.  They know how to ask a

16   proper question, but sometimes we have

17   differences of opinion about what is proper.  So

18   if there is a question asked and there is an

19   objection made, it falls upon the Court to

20   determine whether that question can be answered

21   by this witness.  There may be some objection

22   like, they are not authorized to give that

23   answer.  They don't have personal information to

24   which to give that answer.  They are not

25   qualified to give the answer.  In the event that

*--- Transcript Page 15 ---*

(Full page content preserved in Exhibit 7A. Refer there for original formatting.)

[Transcript Page 15 extracted]

1    there is an objection to a question and I

2    sustain the objection, that's the Court saying,

3    nope, you can't hear that answer from this

4    witness.  If I should overrule the objection,

5    you will hear the answer.  The same goes for a

6    document or exhibit that is offered into

7    evidence.  Document, medical record, picture,

8    something of that nature.  If there is an

9    objection to that and the Court -- the Court is

10    called upon to answer the question is that

11    document or exhibit admissible, if I should

12    sustain the objection, that means you won't see

13    the document, you won't see the picture, you

14    won't see the information.  If I should overrule

15    the objection, you will see it.  You will have

16    it in your hands.  In fact, you will take it

17    with you to the jury room.  In either event,

18    whether it's a question asked or a document or

19    exhibit that is offered, if I should sustain the

20    objection, that's when you don't hear the answer

21    or you don't see the exhibit, it would be

22    improper on your part to speculate what that

23    answer might have been or to speculate what the

24    document or exhibit might have shown you.  I

25    only want you to use legal evidence that comes

--- *Transcript Page 16* ---

(Full page content preserved in Exhibit 7A. Refer there for original formatting.)

[Transcript Page 16 extracted]

1     to you through the proper channels to determine
2     what this case means or what it doesn't mean.
3           This case comes to us by way of an
4     indictment from the February 2022 Grand Jury.
5     The fact that these defendants have been
6     indicted is not to be considered by you, any
7     weight one way or the other.  All this
8     indictment is is the ticket into the room.  I'm
9     going to read to you Jessica Scott's indictment.
10    State of Alabama, Chilton County, Circuit Court
11    19th Judicial Circuit.  The Grand Jury of
12    Chilton County charge that before the finding of
13    the indictment, Jessica J. Scott, whose true
14    name is to the Grand Jury unknown otherwise than
15    as stated, Count 1, did while a responsible
16    person of J      M      E        having permanent
17    or temporary care or custody or responsibility
18    for the supervision of J     M     E     did
19    torture, willfully abuse, cruelly beat or
20    otherwise willfully maltreat J     M
21    E         a child under the age of eighteen
22    years, by locking him in a room and/or failing
23    to care for his basic health and/or hygiene
24    needs in violation of Section 26-15-3 Code of
25    Alabama 1975.  Count 2, Jessica J. Scott, whose

## --- Transcript Page 17 ---

(Full page content preserved in Exhibit 7A. Refer there for original formatting.)

[Transcript Page 17 extracted]

```
 1          name is otherwise unknown to the Grand Jury, did
 2          while a responsible person of J    E
 3          having permanent or temporary care or custody or
 4          responsibility for the supervision of said J
 5          E          , did torture, willfully abuse,
 6          cruelly beat, or otherwise willfully maltreat
 7          J    E        ., a child under the age of
 8          eighteen years, by locking him in a room and/or
 9          failing to care for his basic health and/or
10          hygiene needs in violation of Section 26-15-3
11          Code of Alabama 1975.  Count 3, Jessica
12          J. Scott, whose name is otherwise unknown to the
13          Grand Jury, did while a responsible person of
14          M.  P   having permanent or temporary care or
15          custody or responsibility for the supervision of
16          said M.  P     did torture, willfully abuse,
17          cruelly beat, or otherwise willfully maltreat
18          M.  P   , a child under the age of eighteen
19          years, by locking her in a room and/or failing
20          to care for her basic and/or hygiene needs in
21          violation of Section 26-15-3 Code of Alabama
22          1975 against the peace and dignity of the State
23          of Alabama signed Randall V. Houston, District
24          Attorney.  To that charge, this defendant pleads
25          not guilty.  Codefendant and consolidated with
```

*— Transcript Page 18 —*

(Full page content preserved in Exhibit 7A. Refer there for original formatting.)

[Transcript Page 18 extracted]

```
1      the trial of Jessica J. Scott is John Burton
2      Eubanks, Jr.  He was indicted in February of
3      2022.  I'm reading that indictment.  State of
4      Alabama, Chilton County, Circuit Court 19th
5      Judicial Circuit.  The Grand Jury of Chilton
6      County charge that before the finding of this
7      indictment, John Burton Eubanks, Jr., whose true
8      name is to the Grand Jury unknown otherwise than
9      as stated, Count 1, did while a responsible
10     person of J    M:    . E,      having permanent
11     and/or temporary care or custody or
12     responsibility for the supervision of said J
13     M      E      did torture, willfully abuse,
14     cruelly beat, or otherwise willfully maltreat
15     J.    M:    . E      , a child under the age of
16     eighteen years, by locking him in a room and/or
17     failing to care for his basic health and/or
18     hygiene needs in violation of Section 26-15-3
19     Code of Alabama 1975.  Count 2, John Burton
20     Eubanks, Jr., whose name is otherwise unknown to
21     the Grand Jury, did while a responsible person
22     of J    E,              having permanent or
23     temporary care or custody or responsible for the
24     supervision of said J,    E.    '        did
25     torture, willfully abuse, cruelly beat, or
```

*— Transcript Page 19 —*

(Full page content preserved in Exhibit 7A. Refer there for original formatting.)

[Transcript Page 19 extracted]

```
 1          otherwise willfully maltreat J    E
 2          a child under the age of eighteen years, by
 3          locking him in a room and/or failing to care for
 4          his basic needs and/or hygiene needs in
 5          violation of Section 26-15-3 Code of Alabama
 6          1975.  Count 3, John Burton Eubanks, Jr., whose
 7          name is otherwise unknown to the Grand Jury, did
 8          while a responsible person of M   P     having
 9          permanent or temporary care or custody or
10          responsibility for the supervision of said M
11          P     did torture, willfully abuse, cruelly
12          beat, or otherwise willfully maltreat M   P
13          a child under the age of eighteen years, by
14          locking her in a room and/or failing to care for
15          her basic health and/or hygiene needs in
16          violation of Section 26-15-3 Code of Alabama
17          1975 against the peace and dignity of the State
18          of Alabama signed Randall Houston, District
19          Attorney.  To that charge, this defendant John
20          Burton Eubanks, Jr. pleads not guilty, which
21          brings us to today.  Opening statements by the
22          State.
23              MR. CLECKLEY:  Thank you, Judge.
24                  (Mr. Cleckley presented an opening
25                  statement to the jury.)
```

## --- Transcript Page 20 ---

(Full page content preserved in Exhibit 7A. Refer there for original formatting.)

[Transcript Page 20 extracted]

1          THE COURT:  Opening statements by the
2     defendant.
3          MR. WHITE:  Thank you, Your Honor.
4               **(Mr. White presented an opening
5               statement to the jury.)**
6          THE COURT:  Ladies and gentlemen, let's take
7     a short break before we start with our
8     testimony.  Don't discuss it.  We will be back
9     in about ten or fifteen minutes.  Thank you.
10              **(Brief recess was taken.)**
11         THE COURT:  We're back from our break.  Have
12    each of you been able to comply with my
13    direction?  Let the Record reflect that each
14    member of the jury panel answered in the
15    affirmative with a head nod.
16         Does the State have a witness?  Call your
17    witness, Ms. Williams.
18         MS. WILLIAMS:  Shane Mayfield.
19              **\* \* \* \* \* \* \* \***
20              **SHANE MAYFIELD**
21         The witness, called by the State, after
22    having first been duly sworn to speak the truth,
23    the whole truth, and nothing but the truth, took
24    the stand and testified as follows:
25         THE COURT:  State your name for the Record.

*— Transcript Page 21 —*

(Full page content preserved in Exhibit 7A. Refer there for original formatting.)

[Transcript Page 21 extracted]

1    THE WITNESS:  Shane Mayfield.

2    **DIRECT EXAMINATION**

3    **BY MS. WILLIAMS:**

4    Q.   Where are you employed?

5    A.   Chilton County Sheriff's Office.

6    Q.   In what capacity are you employed there?

7    A.   I'm the assistant chief deputy.

8    Q.   And how long have you been in law enforcement?

9    A.   Since 1993.

10   Q.   What are your duties as the assistant chief

11        deputy?

12   A.   I supervise what we call the special operations

13        division, which is general criminal

14        investigations.  We investigate all felony

15        crimes, drug enforcement, K-9, and swat.

16   Q.   And, Chief, do you recall if you were working on

17        or about July the 30th of 2021?

18   A.   I was.

19   Q.   And did you -- Were you the on-call investigator

20        at that time?

21   A.   I was.  I generally do not take calls, but that

22        week, the investigator that was on call was in

23        an electronic forensic class.  I agreed to take

24        call for her that week.

25   Q.   Do you recall if you responded to 5723 County

## — Transcript Page 27 —

(Full page content preserved in Exhibit 7A. Refer there for original formatting.)

[Transcript Page 27 extracted]

```
 1    A.   Yes, ma'am.  That would be the exterior window
 2         of the room that we're talking about, the front
 3         of the home.  Just to the left of that window,
 4         would be the open garage that I spoke of, and
 5         that window is to the right of that open garage.
 6    Q.   I'm showing you State's Exhibit Number Two.
 7         Tell us what is in that photograph.
 8    A.   That's an inside photo of that same window that
 9         I just described.
10    Q.   This is State's Exhibit Number Three.  Can you
11         tell us what's in this one?
12    A.   Yes, ma'am.  If you look to the right of that,
13         there's a piece of plywood between the door jamb
14         there I guess to keep -- there were some animals
15         inside -- to keep those from getting out.
16         Behind that to the right is the laundry room
17         that I spoke of that you come into directly out
18         of the open garage.  I'm actually standing in a
19         small bathroom across the hall taking a picture
20         of the wooden door where the children were
21         found.
22    Q.   I'll show you State's Exhibit Number Four.  Can
23         you tell us what we're looking at in this one?
24    A.   It's a closer photo of that door.  You can see
25         there's a hasp about a quarter of the way down
```

*--- Transcript Page 28 ---*

(Full page content preserved in Exhibit 7A. Refer there for original formatting.)

[Transcript Page 28 extracted]

1             on the right side and another hasp at the very
2             bottom just off of the floor.
3     Q.    This is State's Exhibit Number Five.
4     A.    It's a close up picture of the top hasp.
5     Q.    And State's Exhibit Number Six.
6     A.    A close up picture of the bottom one.
7     Q.    This is State's Exhibit Number Seven.
8     A.    Those are two clips kind of similar to the end
9             of a dog leash that Sergeant Davenport had told
10            me were in place holding the hasp closed.  When
11            he arrived, they were on top of the door where
12            you see them now when I arrived.  I just
13            documented, took a photo of them.
14    Q.    And this is State's Exhibit Number Eight.  Can
15            you tell us what is in this photo?
16    A.    It's a photo standing in that doorway that I
17            just described looking into the room taking a
18            picture of the diapers in the floor of the room.
19    Q.    So this what we're looking at here is inside of
20            State's Exhibit Number Four; is that right?
21    A.    Yes, ma'am.  I'm standing in that doorway taking
22            that photo on the right.
23    Q.    And State's Exhibit Number Nine, can you tell us
24            what this is?
25    A.    Just a close up of a diaper that appears to have

## — *Transcript Page 33* —

(Full page content preserved in Exhibit 7A. Refer there for original formatting.)

[Transcript Page 33 extracted]

1          MS. WILLIAMS:  Yes, sir, there is audio.

2          THE COURT:  The exhibit will speak for

3      itself as far as the transcript of what was

4      said.  Thank you.

5               (State's Exhibit Number Twenty-two was

6                    played in open court.)

7          MS. WILLIAMS:  That's all of the body cam,

8      Your Honor.

9          THE COURT:  Thank you.  Back on the Record,

10     please, ma'am.

11  Q.  Chief, in State's Exhibit Number Three, just the

12      picture of the door, can you explain to us how

13      the door opens and closes?

14  A.  On the -- As she's holding it, the hinge side

15      would be on your left, her right, and the hasp

16      would be on the right side.  The door hinges

17      outward, so it would open from inside to out to

18      the left.

19  Q.  And is there any way to open the door from the

20      inside?

21  A.  No.  Only if the hasps were not -- if the locks

22      weren't on the hasps and it would swing freely.

23      But if the clips were in the hasp, then there

24      is -- especially the one at the bottom, even an

25      adult would have to crawl over it to unhasp that

## --- Transcript Page 34 ---

(Full page content preserved in Exhibit 7A. Refer there for original formatting.)

[Transcript Page 34 extracted]

```
 1            one at the bottom.  An adult could possibly
 2            reach over and get that top one if they had long
 3            enough arms, but it would be impossible to do
 4            the bottom one.
 5    Q.      Chief, did you observe any other doors like this
 6            in the home?
 7    A.      I did not.
 8    Q.      You also testified earlier about a bedroom that
 9            you believed to be Ms. Scott and Mr. Eubanks and
10            there was a bed in that room.  Were there any
11            other beds in the home?
12    A.      No, not that I saw.
13    Q.      And then I want to show you again, it's going to
14            it be State's Exhibit Number Twelve.  I know
15            that we're looking at the photo.  Explain to us
16            where this was on the wall.
17    A.      This would be, I believe, on the front exterior
18            wall near that window, you know, looks to be
19            about eight or ten inches above the floor.
20    Q.      This is State's Exhibit Number Eight.  I'm going
21            to ask you to do the same thing.  Explain to us
22            right here and right here how high is that up on
23            the wall?
24    A.      In the upper left corner of that photograph, you
25            will see that electrical fixture and then the
```

--- *Transcript Page 35* ---

(Full page content preserved in Exhibit 7A. Refer there for original formatting.)

[Transcript Page 35 extracted]

```
 1            stains to the left of it.  That is kind of
 2            upward looking down view photo.
 3      Q.    Were the stains like that up higher on the wall,
 4            though?  Were there any up higher than what
 5            we're looking at right here?
 6      A.    No.  The highest one would be the ones in the
 7            window, which would have been maybe two and a
 8            half feet.
 9      Q.    And in your opinion, what is that that we're
10            looking at on the wall?
11      A.    Based on the -- the feces in the diaper, the
12            smell.  I've raised children.  I've changed
13            children.  The appearance of it, the fact that
14            none of the smears were any higher than the
15            height of the children that were in the room, my
16            common sense told me that that was feces.
17                 MS. WILLIAMS:  One second, Judge.
18      Q.    Chief, did you ultimately charge Jessica Scott
19            and John Eubanks?
20      A.    I did.
21      Q.    For what?
22      A.    For three counts of willful abuse of a child
23            less than eighteen.
24      Q.    And so for John Eubanks, there are three counts
25            for each child that was in the house and then
```

— *Transcript Page 36* —

(Full page content preserved in Exhibit 7A. Refer there for original formatting.)

[Transcript Page 36 extracted]

|   |   |   |
|---|---|---|
| 1 |    | for Jessica Scott there are three counts as well |
| 2 |    | for each child that was in the house? |
| 3 | A. | Correct. |
| 4 | Q. | And tell us why child abuse. |
| 5 | A. | You think about child abuse, you expect to see |
| 6 |    | injury or broken bones or blood.  But I think |
| 7 |    | that our children are our most important |
| 8 |    | resource.  It is up to us as adults to protect |
| 9 |    | them and keep them in a safe environment.  I |
| 10 |   | read the code section.  Mr. Cleckley had went |
| 11 |   | over that with you earlier.  I called the |
| 12 |   | on-call district attorney.  We discussed what I |
| 13 |   | thought, the facts of the evidence that I saw, |
| 14 |   | and I felt that the term willfully mistreat.  I |
| 15 |   | have never kept my children in a condition like |
| 16 |   | that.  I have never had any of my friends, my |
| 17 |   | family, or actually in twenty-nine years have |
| 18 |   | never saw -- |
| 19 |   | MR. WHITE:  I object to the narrative nature |
| 20 |   | of this.  I object to the narrative nature of |
| 21 |   | his testimony, Judge, and irrelevant about him |
| 22 |   | and his friends keep their homes.  So I object |
| 23 |   | to both of those reasons for the Record, Judge. |
| 24 |   | THE COURT:  Okay.  Next question, please, |
| 25 |   | ma'am. |

*--- Transcript Page 37 ---*

(Full page content preserved in Exhibit 7A. Refer there for original formatting.)

[Transcript Page 37 extracted]

```
1     Q.   Chief, this is my last question.  Do you recall
2          that night if Mr. Eubanks said that DHR had been
3          to this home?
4     A.   My recollection was that DHR had been to a
5          previous residence but had not been to that
6          residence.  That was my recollection of the
7          conversation.
8               MS. WILLIAMS:  That's all I have, Judge.
9               THE COURT:  Cross examination by the
10         defendant, please, sir.
11                         CROSS EXAMINATION
12    BY MR. WHITE:
13    Q.   How high was the window?
14    A.   Which part of it?
15    Q.   The window you said has feces on it.  How high
16         was it?
17    A.   To the bottom of it?
18    Q.   Just the whole thing, the very top part of the
19         feces.  In fact --
20              MR. WHITE:  May I approach the witness,
21         Judge?
22              THE COURT:  Yes.
23    Q.   I'm going to show you what has already been in
24         as One and Two.  Is this the window you're
25         talking about?
```

--- *Transcript Page 40* ---

(Full page content preserved in Exhibit 7A. Refer there for original formatting.)

[Transcript Page 40 extracted]

```
 1    Q.   Right.  So when you get there, was there
 2         anything in the room for them to stand on?  Yes
 3         or no.
 4    A.   Not at that time.
 5    Q.   Let me ask you this.  I don't know if you were
 6         here yesterday or not.  I talk way too fast and
 7         I mumble sometimes.  If you don't understand a
 8         question, will you let me know.  Is that fair?
 9    A.   I'm kind of hard hearing, so I'm looking at your
10         mouth.  I'm watching your lips move.
11    Q.   By the way, have I ever come to you and tried to
12         get your version of the story?
13    A.   I don't think we've ever met before today, sir.
14    Q.   Have I ever sent an investigator or another
15         lawyer in my office to speak to you about this?
16    A.   No.
17    Q.   Today is the first time we have ever talked
18         about it?
19    A.   Correct.
20    Q.   Are you the case agent on this case?
21    A.   I am.
22    Q.   Let's talk about what a case agent means.  Case
23         agent means that you're in charge of the
24         investigation.  Do you agree with that?
25    A.   I do.
```

*--- Transcript Page 41 ---*

(Full page content preserved in Exhibit 7A. Refer there for original formatting.)

[Transcript Page 41 extracted]

1    Q.   And by the way, I apologize, lieutenant,
2         captain?
3    A.   Assistant Chief.  Whatever works.  I'm not big
4         on titles.
5    Q.   So, Chief, you've been with Chilton County for,
6         I think, a long time in law enforcement?
7    A.   I've been with Sheriff's Office since January
8         1999.
9    Q.   Twenty-three years?
10   A.   Yes, sir.  I was at the City of Millbrook for
11        five and a half years prior to that.
12   Q.   So about thirty years in law enforcement?
13   A.   Correct.
14   Q.   Let's talk about what case agents are.  So you
15        went to the academy at some point.  Do you agree
16        with that?
17   A.   June of 1992.
18   Q.   And you got post certified and you graduated.
19        Do you agree with that?
20   A.   Yes, sir.
21   Q.   And at that time, you went straight to Millbrook
22        to work, correct?
23   A.   Yes, sir.
24   Q.   And when you're at Millbrook, I assume that they
25        send you with a training officer.  Do you agree

--- *Transcript Page 42* ---

(Full page content preserved in Exhibit 7A. Refer there for original formatting.)

[Transcript Page 42 extracted]

```
 1            with that?
 2    A.   That we had a training officer?
 3    Q.   I assume someone got in the car with you and
 4            trained you for about six months.
 5    A.   You would assume, but no, sir, that did not
 6            happen.  It was, here's the keys to the car, go
 7            forth and do good.
 8    Q.   Is that normal?
 9    A.   Well, not in this day and age, but at that time
10            for a small town with not much money, not much
11            resources, that was par for the course,
12            unfortunately.
13    Q.   You left there and you went with the Sheriff's
14            Department, correct?
15    A.   Yes.
16    Q.   The five years you were at Millbrook, were you
17            patrol?
18    A.   I was initially a patrol officer, promoted to
19            corporal, then sergeant, and then to lieutenant
20            over patrol before I left.  There was about a
21            year and nine months that I was assigned to
22            tri-county drug task force.
23    Q.   Were you ever an investigator there or
24            detective?
25    A.   Only narcotics.
```

*--- Transcript Page 43 ---*

(Full page content preserved in Exhibit 7A. Refer there for original formatting.)

[Transcript Page 43 extracted]

```
 1      Q.   Narcotics?
 2      A.   Yes.
 3      Q.   When you went with the sheriff, did you go to
 4           patrol?
 5      A.   Again, in a small, rural county, you kind of
 6           wear a lot of hats.  I wore a uniform and
 7           answered patrol calls, but I supervised
 8           investigations.
 9      Q.   How long have you been doing investigations or
10           detective work for the Sheriff's Office?
11      A.   Since is January of '99.
12      Q.   So off and on for thirty years?
13      A.   Yes.
14      Q.   Were you ever assigned to full time being an
15           investigator or detective?
16      A.   I've been assigned to supervise investigations
17           and do that for roughly the last twelve, fifteen
18           years.
19      Q.   As a case agent, you kind of put together the
20           case file, the evidence that y'all say y'all
21           have and y'all turn it over to a DA's Office.
22           Do you agree with that?
23      A.   I do.
24      Q.   As the case agent, as the person in charge, you
25           dictate or you're in charge of the flow of that
```

--- *Transcript Page 44* ---

(Full page content preserved in Exhibit 7A. Refer there for original formatting.)

[Transcript Page 44 extracted]

```
 1            case.  Do you agree with that?
 2      A.    Not once it is turned over to the District
 3            Attorney's Office.
 4      Q.    Before it's turned over.
 5      A.    Yes.
 6      Q.    If you want -- If you think someone needs to be
 7            interviewed, then either you do it or you tell
 8            another officer to do it and as the case agent
 9            they go do that.  Do you agree with that?
10      A.    I do.
11      Q.    Do you agree with me as the case agent that you
12            ask for crime scene units or technicians to come
13            to a crime scene or you tell another officer to
14            have them come.  Do you agree with that?
15      A.    If we had the luxury of having such a unit, I
16            would, but we do not.  We are kind of -- Like
17            I said, we wear many hats.  You eat what you
18            kill.
19      Q.    Let's be honest with the jury.  When Chilton
20            County, if y'all don't have it, call ALEA or
21            maybe even the federal government to a crime
22            scene if it is something that y'all just aren't
23            equipped to handle to have them look at a crime
24            scene.  Do you agree with that?
25      A.    If it were something we were not equipped to
```

*--- Transcript Page 47 ---*

(Full page content preserved in Exhibit 7A. Refer there for original formatting.)

[Transcript Page 47 extracted]

1        contaminate a scene.  Do we agree with that?
2   A.   Yes.
3   Q.   You go to a murder scene, you walk in, y'all
4        don't just have everybody and their brother
5        walking around in there touching things.  Do you
6        agree with that?
7   A.   Yes.
8   Q.   Because that easily, again not junk science,
9        could contaminate the crime scene, correct?
10  A.   Yes.
11  Q.   And if there was DNA from my clients, then that
12       could contaminate it or if it was someone else,
13       then it could contaminate that DNA.  Do you
14       agree with that?
15  A.   I'm not sure what relevance that has, but I
16       agree.
17  Q.   So that's a crime scene.  The window is a crime
18       scene.  The stuff on the window is part of the
19       crime scene.  We have gotten all the way to
20       there.  We agree with that, correct?
21  A.   Yes.
22  Q.   So when y'all had crime scene technicians,
23       either y'all or ABI, whoever, what substance --
24       when y'all had that tested, I only assume and
25       hope you did, what substance came back from the

— *Transcript Page 48* —

(Full page content preserved in Exhibit 7A. Refer there for original formatting.)

[Transcript Page 48 extracted]

1   Department of Forensic Science lab that is on

2   that window?  Just tell the ladies and gentlemen

3   of the jury after it was preserved, after it was

4   collected, after it was tested, because that's

5   why we're here today part of it, what substance

6   was that?

7 A. There is no serological test performed by the

8   Alabama Department of Forensic Science for

9   feces.

10 Q. Your testimony under oath, I want to make sure

11   you're right, you are telling me right now that

12   you know for a fact that the Department of

13   Forensic Science or ABI or FBI cannot test a

14   substance to see if it is human feces, animal

15   feces, or paint, or caulk?  Is that your

16   testimony under oath, Assistant Chief?

17 A. I spoke with Brian Smith with the Alabama

18   Department of Forensic Science yesterday

19   afternoon and confirmed that they do not test

20   feces.  There is no serological examination for

21   feces that will test positive by the Alabama

22   Department of Forensic Science.  I can't speak

23   for the FBI or anyone else.

24    Prior to that day, I had attempted to submit

25   feces on burglary cases before and had been

## --- Transcript Page 49 ---

(Full page content preserved in Exhibit 7A. Refer there for original formatting.)

[Transcript Page 49 extracted]

```
 1                refused by the Alabama Department of Forensic
 2                Sciences to submit feces.
 3        Q.     I appreciate that.  My question to you again,
 4                this is under oath, it's your testimony that the
 5                substance on that could not have been tested,
 6                hear me out, for human feces, for animal feces,
 7                for paint?  We agree paint gets tested all the
 8                time at the forensic science?  I assume we can
 9                agree on that?
10        A.     Yes.
11        Q.     Caulk, right?
12        A.     I have never tested caulk, but I'm not sure if
13                it could be -- the problem is -- my
14                understanding is that several chemical
15                compounds, whether or not the result of that is
16                actually going to come back and say caulk or say
17                paint.  I don't think you are going to get that
18                result.
19        Q.     Oh, I agree with you.  But what we would get are
20                scientists that have been specially trained to
21                tell us what substances, it's usually big words
22                definitely that I don't understand, what that
23                is.  We agree with that?  I agree it doesn't
24                come back paint, but it comes back with
25                substances that definitely aren't involved in
```

### — *Transcript Page 50* —

(Full page content preserved in Exhibit 7A. Refer there for original formatting.)

[Transcript Page 50 extracted]

```
 1          the feces world.  We agree with that?
 2    A.    The problem being --
 3    Q.    Detective, my question is, do we agree with that
 4          that it comes back and it has substances, paint
 5          or caulk, that aren't related remotely in the
 6          feces world?  We agree with that or disagree
 7          with that?  That's only the question I'm asking
 8          you.
 9    A.    Well, it doesn't get that far.  I don't agree
10          with it because I need to answer the question
11          you can't get that far.
12    Q.    I tell you what.  I will move on.  Did y'all
13          have anything you tested whatsoever on that
14          window?  Yes or no.
15    A.    No.
16    Q.    And you said, I found that interesting and I
17          appreciate you saying it, you called yesterday.
18          Like the day of the guy's trial and the woman's
19          trial, that's when you called forensics was
20          yesterday?
21    A.    To verify that nothing had changed.  I had
22          attempted to submit feces on other cases and
23          been denied.
24    Q.    Right.  But paint, caulk.  Because if that comes
25          back -- if we submit that and we don't make a
```

--- *Transcript Page 51* ---

(Full page content preserved in Exhibit 7A. Refer there for original formatting.)

[Transcript Page 51 extracted]

```
 1          phone call the day of a man's jury trial, that
 2          easily could have come back as what, paint.  But
 3          we did not collect anything or send anything
 4          off, did we?
 5   A.     No.
 6   Q.     The stuff on the wall that you get up there --
 7          and I'm not trying to argue with your opinion
 8          that is feces.  We simply could have tested it,
 9          and it would have resolved it, hey, that's
10          paint, correct?
11   A.     My opinion it wasn't paint.  That's all I can
12          tell you, sir.
13   Q.     In fact, I thought I heard this during the
14          video.  If they want to listen to it down the
15          road, they can.  I thought I heard another
16          officer, it's been peeling off the wall.  The
17          paint is what he was talking about.  Do you
18          agree with that?  Did I misunderstand one of
19          your deputies?
20   A.     I haven't heard that.
21   Q.     You didn't hear that?  Have you listened to that
22          before today, by the way?
23   A.     I have.
24   Q.     When?
25   A.     The last time was yesterday.
```

--- *Transcript Page 52* ---

(Full page content preserved in Exhibit 7A. Refer there for original formatting.)

[Transcript Page 52 extracted]

```
 1    Q.   And you don't recall any deputy making a comment
 2         about peeling off?
 3    A.   No.
 4    Q.   Is that the first time you had ever been to
 5         their house?
 6    A.   Yes.
 7    Q.   In your thirty years with Chilton County, had
 8         you ever personally ever been to their home?
 9    A.   Not that I recall.
10    Q.   In the thirty years that you've been a detective
11         or a case agent or a deputy sheriff or assistant
12         chief, do you know of any complaints they have
13         ever had regarding children being treated
14         wrongly?
15    A.   No.
16    Q.   I will be honest, it sounded like when you were
17         talking to detective -- or Mr. Stewart that you
18         had kind of already made up your mind that they
19         were guilty and they were going to get arrested.
20         Do you agree with that?  That's the way it came
21         across to me.
22    A.   I made up my mind after -- as I was talking to
23         Mr. Stewart, the -- when I talked to
24         Mr. Stewart, the question in my mind was did
25         what I saw manifest while they were gone and
```

--- *Transcript Page 54* ---

(Full page content preserved in Exhibit 7A. Refer there for original formatting.)

[Transcript Page 54 extracted]

```
1    A.   Yes.
2    Q.   Is your theory by the way, going against all of
3         this of who you interviewed or didn't interview,
4         but is your theory that before they go to work
5         that the diapers were already there or while
6         they are gone at work they get there?  Through
7         your investigation as the case agent, all the
8         evidence you've collected, what say you?
9    A.   What say me is three children did not create
10        that many diapers in that short a period of
11        time.
12   Q.   I appreciate you saying that.  My question to
13        you is -- I mean, they are on trial, right, for
14        a serious crime.  My question to you as the case
15        agent, the top police officer on this case, were
16        the diapers there -- do you have any evidence
17        whatsoever, one piece of evidence, just one,
18        that the diapers were in that room --
19             MR. WHITE:  May I approach, Judge?
20             THE COURT:  Yes.
21   Q.   Do you have any evidence, Assistant Chief, just
22        one that you can tell the jury beyond a
23        reasonable doubt or really any doubt -- those
24        pictures I just showed you for the Record are
25        State's Exhibits, pictures of the room the
```

### --- Transcript Page 55 ---

(Full page content preserved in Exhibit 7A. Refer there for original formatting.)

[Transcript Page 55 extracted]

```
1              children were in, right?
2     A.   Yes.
3     Q.   And it's disgusting.  You agree with me on that?
4     A.   I do.
5     Q.   And there's a bunch of diapers.  Do you agree
6              with that?
7     A.   I do.
8     Q.   Tell the jury one piece of evidence, just one,
9              that says that those were there when they left
10             for work at two o'clock.  Just one piece of
11             evidence.  Tell them.
12    A.   I don't know.  I wasn't there at two o'clock.
13    Q.   I didn't ask you that.  My question is through
14             the investigation -- We put handcuffs on these
15             people and we took them to jail, right?
16    A.   Yes.
17    Q.   Here we are.  They are saying they are innocent.
18             They get to decide.  You agree with that?
19    A.   I do.
20    Q.   Tell the jury one piece of evidence that you
21             collected as the case agent, the top police
22             officer, that they -- that those right there,
23             the disgusting pictures, that they had any
24             knowledge of that before they went to work at
25             two o'clock.  Just one piece.  Tell them.
```

### --- *Transcript Page 56* ---

(Full page content preserved in Exhibit 7A. Refer there for original formatting.)

[Transcript Page 56 extracted]

1   A.  There is no evidence to indicate that those
2       diapers were present at two o'clock.
3   Q.  When they went to work?
4   A.  That is not the only thing that I made my
5       determination to charge with.
6   Q.  We're going to get to all of that.  We're going
7       to go one at a time.  So we have none that they
8       even knew that that was there, correct?
9   A.  No.
10  Q.  So Mr. Stewart doesn't see them and he was the
11      last one in that house before they go to work
12      besides who?  Travis?
13  A.  He did not mention them in the interview.
14  Q.  Don't you think he would have, Detective?  He's
15      mentioning the feces on the wall allegedly.  He
16      is making a notice of the naked children.  Don't
17      you think that Mr. Stewart, if he testifies we
18      can ask him, would definitely mention the
19      disgusting diapers in the middle of the room?
20      Wouldn't you think that is common sense?  He's
21      telling you about naked babies.
22  A.  I would hope that he would, but I'm not going to
23      testify for him, sir.
24  Q.  Okay.  If he testifies, we will see what he
25      says.  The only thing that he sees are three

*--- Transcript Page 57 ---*

(Full page content preserved in Exhibit 7A. Refer there for original formatting.)

[Transcript Page 57 extracted]

```
 1         naked little kids?
 2   A.    That's the only thing he related to me in the
 3         interview.
 4   Q.    Is this out in the country?
 5   A.    It's a rural part of the county.
 6   Q.    What time of year is it again?
 7   A.    July.
 8   Q.    Hot.  In fact, y'all have made a lot of mention
 9         of how hot it is inside that room.  Do you
10         remember that?
11   A.    I believe I said that it was -- I wouldn't
12         describe it as hot.  It was warm, warmer than
13         the rest of the house.
14   Q.    Do you have any idea if Mr. Stewart before he
15         even got there if the kids were running around
16         getting wet with a water hose, anything like
17         that, just being kids?
18   A.    No.
19   Q.    Do you have any evidence?
20   A.    No.
21   Q.    Are there any other houses immediately around
22         that home?
23   A.    There's some within a couple hundred yards.
24   Q.    Yeah.  So he sees some naked children in July
25         and he sees stuff on the window that he says is
```

*--- Transcript Page 58 ---*

(Full page content preserved in Exhibit 7A. Refer there for original formatting.)

[Transcript Page 58 extracted]

1          feces?
2     A.   Yes.
3     Q.   Anything else I've missed?
4     A.   The fact that there's nothing to eat or drink.
5     Q.   From Mr. Stewart, by the way.  Anything else
6          from Mr. Stewart that I'm missing?
7     A.   No.
8     Q.   What time did he call 911, the police?  We agree
9          he said he left, correct me if I'm wrong, at
10         about 12:13 p.m.  Do we agree with that?
11    A.   Yes.
12    Q.   What time did he call -- I assume he called 911
13         at 12:30?
14    A.   I think it was around six o'clock.  It was in
15         the evening.
16    Q.   We have a technician.  Are you aware, by the
17         way, of all the AT&T technicians that had been
18         there in the last week?
19    A.   I am not.
20    Q.   Was today during my opening the first time you
21         had ever heard that?
22    A.   It was.
23    Q.   So you didn't interview anybody else after that
24         night, did you, at all?
25    A.   No.

--- *Transcript Page 59* ---

(Full page content preserved in Exhibit 7A. Refer there for original formatting.)

[Transcript Page 59 extracted]

| | | |
|---|---|---|
| 1 | Q. | In fact, once they got handcuffs put on, took |
| 2 | | them to the county jail, did you do any other -- |
| 3 | | I know you are busy.  I'm not trying to beat you |
| 4 | | up.  I promise you I'm not.  I've got a job to |
| 5 | | do.  Did you do any investigation work, any |
| 6 | | after they got taken to Chilton County jail? |
| 7 | | That is yes or that's no.  Anything? |
| 8 | A. | I did several follow ups with DHR. |
| 9 | Q. | Tell me about those. |
| 10 | A. | With Ms. Hamilton on placement of the kids. |
| 11 | Q. | Anything else as far as their criminal case? |
| 12 | | Not placement of the kids.  Criminal case is |
| 13 | | what we're here for today. |
| 14 | A. | No. |
| 15 | Q. | None.  I mean zero, correct? |
| 16 | A. | They were -- |
| 17 | Q. | They were arrested.  They were booked and the |
| 18 | | case was over in essence. |
| 19 | A. | I think the implication is there was no |
| 20 | | interview done. |
| 21 | Q. | We will get to that. |
| 22 | A. | And that there was not an interview done. |
| 23 | Q. | I am talking about interviews.  At this point, |
| 24 | | I'm saying anything. |
| 25 | A. | No. |

--- *Transcript Page 60* ---

(Full page content preserved in Exhibit 7A. Refer there for original formatting.)

[Transcript Page 60 extracted]

```
 1    Q.   Now, he sees this, the naked baby and the stuff
 2         on the window, and it is just terrible, right?
 3         I mean, that's -- He made it sound like he was
 4         infuriated and that he had to tell someone,
 5         right?  Did that come across to you like it did
 6         me?
 7    A.   It did.
 8    Q.   Yet he doesn't call law enforcement, the people
 9         in charge, that's what y'all do and y'all do a
10         good job of it most of the time, he doesn't call
11         y'all for six hours, correct?
12    A.   Correct.
13    Q.   So what we have, if you believe Mr. Stewart, is
14         a house of horrors with two monsters leading the
15         charge and he's fine for six hours not letting
16         authorities know about the house of horrors.  Do
17         you agree with my assessment on that?
18    A.   I do not.
19    Q.   Which part?
20    A.   When he said he spoke with Matt Moses, that's
21         his supervisor.
22    Q.   What time did he speak to Mr. Moses?
23    A.   I'm not sure.
24    Q.   I assume you called Mr. Moses and asked him what
25         time did he call you?  Did you talk to Mr. Moses
```

*--- Transcript Page 61 ---*

(Full page content preserved in Exhibit 7A. Refer there for original formatting.)

[Transcript Page 61 extracted]

```
 1            his supervisor?  Yes or no.
 2    A.      He told me during the interview, before the
 3            interview he did.
 4    Q.      I didn't ask you that.  I asked you did you call
 5            Mr. Moses?
 6    A.      No.  The fact that he called Mr. Moses about is
 7            getting involved.  AT&T has a policy not to get
 8            involved in people's lives and what they see in
 9            people's homes.  He was afraid to lose his job.
10    Q.      I'm with you on Mr. Stewart.  But come on, now.
11    A.      Well, you're weighing your livelihood versus
12            reporting something that might cause you your
13            job.
14    Q.      You're telling me if Mr. Stewart sees a woman
15            being raped on the floor of a house he is
16            installing a telephone, surely you're not
17            suggesting --
18    A.      No.  I think if he saw a woman being raped, he
19            would intervene.
20    Q.      Let me finish my question.  You're not
21            suggesting that AT&T's policy -- if so, I want
22            to know who you talked to that told you about
23            that policy, that AT&T's policy is that they
24            can't call law enforcement if a woman is being
25            raped or a guy has a gun to someone's head.
```

--- *Transcript Page 62* ---

(Full page content preserved in Exhibit 7A. Refer there for original formatting.)

[Transcript Page 62 extracted]

```
1    A.   We're not talking about those two instances.
2    Q.   No, but we're talking about a sick place, a
3         house of horrors, if it's true, that is not as
4         bad remotely as a rape, but I promise you this.
5         We agree it ain't a speeding ticket either?
6    A.   No.
7    Q.   Who does call law enforcement?
8    A.   Mr. Stewart.
9    Q.   Mr. Stewart, right?
10   A.   Yes.
11   Q.   So you just told the jury that he had to call
12        his supervisor, that he is scared of losing his
13        job.  I don't want him to lose his job.  At the
14        end of the day, he called anyway, correct?
15   A.   He did.
16   Q.   Six hours later, correct?
17   A.   Correct.
18   Q.   That is not a red flag to you, by the way?  A
19        house of horror and he -- I'm sure he went to
20        lunch and other calls and enjoyed his day.  That
21        is not a red flag to you that, hey, this is
22        getting blown out of portion as far as their
23        guilt?  Is that a red flag to you at all?  Maybe
24        it is not.
25   A.   The man is trying to make a determination on
```

*— Transcript Page 63 —*

(Full page content preserved in Exhibit 7A. Refer there for original formatting.)

[Transcript Page 63 extracted]

```
 1           whether or not he wants to lose his livelihood
 2           and his career is not a red flag to me, no.
 3      Q.   Well, who in the world did you talk to,
 4           Detective, that said for six hours that
 5           conversation went on about him losing his
 6           livelihood?  Who did you talk to that said,
 7           yeah, for six hours we had like a board meeting
 8           at AT&T and we said, son, you're fine, go ahead
 9           and call the police?  There was no one that told
10           you that, correct?
11      A.   Mr. Stewart has told me that since that day.
12      Q.   When?
13      A.   On two or three occasions when I have spoke with
14           him about --
15      Q.   Is it in your case file?
16      A.   I believe it is.
17      Q.   All three times you spoke to him?
18      A.   No.
19      Q.   Why not?
20      A.   During conversations about being available for
21           preliminary hearing and things are not normally
22           included in the case file.
23      Q.   What did he say he did for six hours and who did
24           he speak to about losing his job?
25                MS. WILLIAMS:  Judge, I'm going to object.
```

--- *Transcript Page 65* ---

(Full page content preserved in Exhibit 7A. Refer there for original formatting.)

[Transcript Page 65 extracted]

1          recording that he talked with him.
2     Q.   What time did you arrive?
3     A.   I would have to refer to my notes.
4     Q.   Please do.  Might make it easier, Detective, if
5          you can give me a ballpark.  I'm not going to
6          hold you to it.
7     A.   I'm sorry?
8     Q.   If you can give me a ballpark, we can move this
9          along.  I'm not going to hold you to it.  Was it
10         around six, seven?  Like I said, I'm not going
11         to --
12    A.   It would have been between six and seven, yes.
13         I was looking for the time that the consent was
14         signed.
15    Q.   Six to seven is fine.  You got dispatched out
16         there because the other detective was on
17         training?
18    A.   Correct.
19    Q.   When you got there, was patrol units already
20         there?
21    A.   They were.
22    Q.   Were my clients there?
23    A.   Ms. Scott was.  Mr. Eubanks arrived shortly
24         after I did.
25    Q.   So they both were there, correct?

*— Transcript Page 66 —*

(Full page content preserved in Exhibit 7A. Refer there for original formatting.)

[Transcript Page 66 extracted]

1    A.   Yes.

2    Q.   Did they ever try to run or escape or leave or

3         anything like that?

4    A.   No.

5    Q.   Did you talk to both of them there?

6    A.   I never directly spoke to either one of them.

7         Sheriff Shearon was talking with Mr. Eubanks and

8         Ms. Hamilton was talking with Ms. Scott.  I

9         basically listened to their conversation and the

10        responses to the questions that they asked.

11   Q.   I might have missed it.  On that tape, the body

12        cam, was Ms. Scott interviewed on that?

13   A.   No.  She was seen originally when we walk in

14        standing there with Ms. Hamilton.

15   Q.   Ms. Hamilton is a detective?

16   A.   DHR worker.

17   Q.   Not law enforcement?

18   A.   No.

19   Q.   So when law enforcement interviewed them, let's

20        start first at the scene, I assume like normal

21        when you have two people -- because you charged

22        both of them, correct?

23   A.   Yes.

24   Q.   Do you think they both were in on it?  Do you

25        know -- like you see what I'm saying.  You

*--- Transcript Page 67 ---*

(Full page content preserved in Exhibit 7A. Refer there for original formatting.)

[Transcript Page 67 extracted]

```
1            charged both.  What evidence is there that both
2            of them were on it?
3     A.     It's their home.  They are both responsible for
4            those children.
5     Q.     I got that.  But if someone dies, someone gets
6            murdered in the home, y'all don't automatically
7            arrest the husband and the wife because there is
8            a dead body in the den.  You might, but you've
9            got to base that on evidence.  What evidence
10           that they both were in on anything?
11    A.     Mr. Stewart's statement that they were both
12           there that day at noon when those conditions
13           existed in that room.
14    Q.     No.  I thought -- He didn't say anything about
15           the room, now.  I thought he said there were
16           naked children and there was stuff on a window.
17           I don't think Mr. Stewart talked about anything
18           in that room.
19    A.     I think the window he is talking about is that
20           room.
21    Q.     He saw that on the outside, correct?
22    A.     Yes.
23    Q.     And so again -- I'm just asking.  Is that why
24           both of them had handcuffs?  They just both
25           lived there?  Because her mom was there the day
```

*— Transcript Page 69 —*

(Full page content preserved in Exhibit 7A. Refer there for original formatting.)

[Transcript Page 69 extracted]

|    |    |                                                              |
|----|----|--------------------------------------------------------------|
| 1  |    | him a picture of just her.  Do you agree with                |
| 2  |    | that?                                                         |
| 3  | A. | Yes.  And the reason for that -- but you're                  |
| 4  |    | correct, yes.                                                 |
| 5  | Q. | So we're out there, and y'all at least what I                |
| 6  |    | think -- In law school, they tell us not to ask              |
| 7  |    | questions I don't know the answer to.  I do it               |
| 8  |    | all the time.  Here is an example.  In most                  |
| 9  |    | cases I think when y'all have two defendants or              |
| 10 |    | three, whatever, five, eight, y'all separate                 |
| 11 |    | them, correct?                                                |
| 12 | A. | If there is going to be an interview at a later              |
| 13 |    | time, we would.                                              |
| 14 | Q. | Right, that's what I'm talking about.  The                   |
| 15 |    | reason y'all do that, it is good police work.                |
| 16 |    | So if my story is the cocaine in the car was                 |
| 17 |    | Alex's, right, she is not right next to me to                |
| 18 |    | hear that, correct?                                           |
| 19 | A. | Correct.                                                      |
| 20 | Q. | So when she's being interviewed by a different               |
| 21 |    | detective, they are going to get her point of                |
| 22 |    | view without me sitting there next to her                    |
| 23 |    | because she might not want to say something with             |
| 24 |    | me there.  Is that -- Do you agree with that?                |
| 25 | A. | I do.                                                         |

*--- Transcript Page 70 ---*

(Full page content preserved in Exhibit 7A. Refer there for original formatting.)

[Transcript Page 70 extracted]

70

1   Q.   That is standard detective work 101, correct?

2   A.   Yes.

3   Q.   So I want to know what law enforcement at this

4        seen -- because she's about to have handcuffs

5        put on her that night.  I want to know what law

6        enforcement agent's name and department

7        interviewed my client that evening?

8   A.   None.

9   Q.   At the house?

10  A.   Nobody.

11  Q.   So y'all are about to put handcuffs on her and

12       no one, no one even said, ma'am, come here.

13       Look in that room.  It's disgusting.  What do

14       you say about it?  What is your story about it?

15       What do you have to say?  Have you been -- Have

16       you been here the whole day?  Have you been at

17       work?  Tell me about it.  Y'all didn't do that,

18       did you?

19  A.   I didn't say no one did that.  I said

20       Ms. Hamilton had a conversation with her.  There

21       is no since in asking the same questions over

22       again.

23  Q.   Oh, Detective, Ms. Hamilton, no offense to her,

24       she's a DHR worker.  She is not trained.  You're

25       the one to have the handcuffs, not her, correct?

--- *Transcript Page 71* ---

(Full page content preserved in Exhibit 7A. Refer there for original formatting.)

[Transcript Page 71 extracted]

```
 1    A.   The information is the same, Counselor.
 2    Q.   Man, how many cases -- I will be honest.  I have
 3         never heard of that that when we charge people
 4         or not charge people is based on, before we
 5         handcuff them, DHR interviewing people.  For
 6         twenty years, federally and state and city, I
 7         see y'all take people to y'all's departments or
 8         sometimes if they are going to work for y'all in
 9         narcotics, kind of behind the gas station,
10         whatever.  But law enforcement is who questions
11         people before we put handcuffs on people.  Do
12         you agree with that for the most part?
13    A.   In many instances but not all.
14    Q.   Yes.  Before y'all put handcuffs on her, what
15         officer went to the DHR lady, Ms. Hamilton, and
16         got her statement of what my client said?  Who
17         did that?
18    A.   I was standing there present during the
19         conversation.  I didn't have to go to her.
20    Q.   You were standing there next to Ms. Hamilton
21         interviewing her?
22    A.   Yes.
23    Q.   You never jumped in as a thirty year career --
24         Obviously, you've done very well to be Assistant
25         Chief.  You didn't step in at all and ask your
```

--- *Transcript Page 76* ---

(Full page content preserved in Exhibit 7A. Refer there for original formatting.)

[Transcript Page 76 extracted]

```
 1    A.   I have an explosive older dog.  And the leather
 2         lead that I use has almost that identical clip
 3         that I clip to her collar.
 4    Q.   In essence, what they -- let's say that clip did
 5         go to dog leashes.  Let's say that's the only
 6         reason that is even made is dog leashes.
 7    A.   That's reference is what is on my dog lead.  I'm
 8         not saying they led them around by a dog leash
 9         or that a dog leash was involved.  I'm simply
10         referencing that from my experience from what I
11         have that matches that.
12    Q.   Do you not agree maybe just there were some
13         hooks there?  Dog leash to me makes it sound
14         like you are suggesting that they are leading
15         these kids around with a leash.
16    A.   I'm not suggesting that they led the kids around
17         with a leash.  I'm just suggesting that that is
18         a similar clip that is on my dog lead that I use
19         for my dog.
20    Q.   Let's talk about Mr. Eubanks.  What law
21         enforcement agency that's been trained
22         interviewed him at the scene?
23    A.   Sheriff Shearon had a conversation with him in
24         the garage.
25    Q.   Who?
```

--- *Transcript Page 77* ---

(Full page content preserved in Exhibit 7A. Refer there for original formatting.)

[Transcript Page 77 extracted]

1    A.    My sheriff, John Shearon.

2    Q.    And I assume it was recorded and written down

3          and all of that like normal?

4    A.    Part of that conversation is on that video.

5    Q.    What we heard?

6    A.    Correct.

7    Q.    Anything else that we didn't hear?  Where was

8          the rest of the questioning, the interrogation?

9          Where was the rest of that?

10   A.    Prior to the -- during the consent being signed

11         and prior to, Mr. Eubanks stated that he had

12         taken the beds and stuff out of the room about a

13         week prior because the children were turning the

14         beds over.

15   Q.    And I missed it.  I didn't hear Ms. Hancock, and

16         I don't think I've seen it in the file, read her

17         her fifth amendment rights.  Did she?  I didn't

18         see it.  Because she's questioning her and DHR

19         turn reports over to y'all as law enforcement

20         when they do investigations.  Do you agree with

21         that?

22   A.    Generally, we do not get reports from DHR on

23         children.

24   Q.    Really?

25   A.    No.